UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

MARVIN SCOTT HORN,

                Petitioner,                Case No. 1:10-cv-680

v.                                        Honorable Robert J. Jonker

BLAINE LAFLER,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254. After a jury trial in Kalamazoo County Circuit Court, Petitioner was convicted of

kidnapping, MICH. COMP. LAWS § 750.349, and four counts of first-degree criminal sexual conduct,

MICH. COMP. LAWS § 750.520b. On July 17, 2006, the trial court sentenced Petitioner as a second

habitual offender, MICH. COMP. LAWS § 769.10, to five concurrent prison terms of 40 to 60 years.

In his *pro se* petition (docket #1), Petitioner raises the following grounds for habeas corpus relief:

    I.      PETITIONER WAS DENIED HIS FOURTEENTH AMENDMENT DUE
           PROCESS RIGHT TO A FAIR TRIAL WHERE THE PROSECUTION
           COMMITTED MISCONDUCT BY[:]

           A.      INTRODUCING UNNOTICED PRIOR BAD ACT[S] EVIDENCE
                  THROUGH CHARLOTTE HORN[];

           B.      [INTRODUCING UNNOTICED PRIOR BAD ACT[S] EVIDENCE
                  THROUGH] LAURA HORN;

           C.      BY ADMITTING PRIOR BAD ACT[S] EVIDENCE IN
                  RESPONSE TO CHARACTER EVIDENCE;

           D.      BY USING PETITIONER'S INVOCATION OF HIS RIGHT TO
                  SILENCE AS SUBSTANTIVE EVIDENCE OF GUILT, AND;

E.      BY MISREPRESENTING THE EVIDENCE AND COMMENTING ON FACTS NOT IN EVIDENCE.

II.     PETITIONER'S FIFTH AND FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL WAS VIOLATED WHERE HE WAS PHYSICALLY RESTRAINED BY LEG SHACKLES THROUGHOUT THE TRIAL WITHOUT A SHOWING OF NECESSITY FOR SUCH RESTRAINTS.

III.    PETITIONER WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL[:]

A.      [FAILED TO OBJECT TO THE SEVERAL INSTANCES OF PROSECUTORIAL MISCONDUCT WHERE THE PROSECUTOR] INTRODUCED UNNOTICED PRIOR BAD ACT(S) EVIDENCE THROUGH CHARLOTTE HORN; []

B.      [FAILED TO OBJECT TO THE SEVERAL INSTANCES OF PROSECUTORIAL MISCONDUCT WHERE THE PROSECUTOR] INTRODUCED UNNOTICED PRIOR BAD ACT(S) EVIDENCE THROUGH LAURA HORN;

C.      ADMITTED PRIOR BAD ACTS EVIDENCE IN RESPONSE TO CHARACTER EVIDENCE;

D.      USED PETITIONER'S INVOCATION OF HIS RIGHT TO SILENCE AS SUBSTANTIVE EVIDENCE OF GUILT[];

E.      MISREPRESENTED THE EVIDENCE AND COMMENTED ON FACTS NOT IN EVIDENCE;

F.      FAILED TO OBJECT TO JUROR(S) VIEWING PETITIONER IN LEG SHACKLES;

G.      WAS ABSENT AT A CRITICAL STAGE;

H.      FAILED TO INVESTIGATE AND PRESENT WITNESSES;

I.      FAILED TO INTRODUCE BLUE JEANS AS EVIDENCE;

J.      FAILED TO PROPERLY ARGUE THE DUCT TAPE EVIDENCE IN CLOSING ARGUMENT;

> K. FAILED TO IMPEACH [LAURA] HORN'S TESTIMONY WITH POLICE REPORTS;
>
> L. FAILED TO FILE A MOTION FOR A NEW TRIAL BASED ON THE VERDICT BEING AGAINST THE GREAT WEIGHT OF THE EVIDENCE, AND;
>
> M. FAILED TO PRODUCE AT TRIAL AND USE THE FORENSIC EVALUATION OF PETITIONER AND FORENSIC EXAMINATION REPORT FROM MS. HORN'S PHYSICAL EXAMINATION.
>
> IV. PETITIONER'S CONVICTION WAS AGAINST THE GREAT WEIGHT OF THE EVIDENCE AS IT WAS BASED UPON INSUFFICIENT EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.
>
> V. PETITIONER WAS DENIED HIS SIXTH [AMENDMENT] AND FOURTEENTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL AND APPELLATE COUNSEL WHERE BOTH FAILED TO ARGUE THAT THE TRIAL COURT LACKED SUBJECT MATTER JURISDICTION AND VIOLATED PROCEDURAL DUE PROCESS.
>
> VI. PETITIONER WAS DENIED HIS SIXTH [AMENDMENT] AND FOURTEENTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL WHERE HIS APPELLATE COUNSEL FAILED TO RAISE HABEAS CLAIMS I(B), I(C), III(B), III(C), AND V.
>
> VII. NEW EVIDENCE DEMONSTRATES THAT PETITIONER IS ACTUALLY INNOCENT WHICH OVERCOMES THE PROCEDURAL BAR APPLICABLE TO HABEAS CLAIMS I(E), III(E), AND III(M).

(Pet., docket #1, Page ID##11, 12, 15, 16, 18, 19, 21.) Respondent filed an answer to the petition (docket #9) stating that the grounds should be denied because they are without merit, procedurally defaulted or noncognizable claims. Petitioner filed a response (docket #27) to Respondent's answer.

Upon review and applying the Antiterrorism and Effective Death Penalty Act standards, I find that

Petitioner's grounds for habeas corpus relief are without merit, procedurally defaulted or noncognizable state-law or habeas claims. Accordingly, I recommend that the petition be denied.

## I.     Procedural History

### A.     Trial Court Proceedings

The state prosecution arose from Petitioner's alleged abduction and repeated rape of his estranged wife in January 2006 in Kalamazoo County.   At the preliminary examination, Petitioner was bound over on one count of kidnapping and four counts of criminal sexual conduct. (Prelim. Examination at 48, 51, docket #12.) Petitioner was tried before a jury beginning July 11, 2006, and concluding on July 17, 2006.

Laura Horn testified that on January 27, 2006, she met her husband, Petitioner, for dinner at a Red Lobster restaurant in Kalamazoo County.   (July 12, 2006 Trial Tr. Vol. II (Tr. II) at 261-62, docket #14.)   After seventeen years of marriage, Petitioner and Laura had separated in November 2005.  They have two children, Charlotte (15 years old) and Nicholas (17 years old).  (Tr. II at 263.)  Laura testified that they separated after Petitioner held a knife to her throat and sexually assaulted her.  Laura then began divorce proceedings.  (Tr. II at 264.)

Laura Horn agreed to meet Petitioner on January 27, 2006, at Red Lobster because it was the day before Petitioner's birthday and he was going to give her money to help pay for cheerleading for their daughter.  Laura thought it would be a safe place to meet him.  (Tr. II at 265.) When Laura arrived at the restaurant, she parked next to Petitioner's truck in the back of the restaurant and they walked in together.  (Tr. II at 267.)  After dinner, they walked out to their cars. Laura was warming her car up when Petitioner stated that he had a bag of bird seed in the back of his truck for her.  When Laura looked in the back of his truck, Petitioner grabbed her throat and

mouth, and slid her on her back into the truck bed. (Tr. II at 268.) The truck bed had a cap over it but the tailgate was down. Laura screamed and hit and kicked Petitioner but nothing helped. (Tr. II at 269-70.)

When Petitioner got Laura into the back of his truck, he wrapped duct tape around her head five or six times. The tape also covered her mouth. (Tr. II at 270.) Next, Petitioner rolled her over to her side and taped her wrists behind her and taped her ankles. (Tr. II at 270-71.) Petitioner took a cable and tied her wrist and ankles together. (Tr. II at 271.) Laura heard Petitioner close the tailgate and turn off her car. Petitioner then started the truck and drove away. (Tr. II at 272.) About ten minutes later, the truck stopped. Petitioner opened some doors, drove the truck into a garage and closed the doors. Petitioner opened the back of the truck, grabbed Laura by her ankles and slid her to the end of the tailgate. Petitioner took the cable off and removed the duct tape from Laura's ankles. (Tr. II at 273-74.) At this point, the duct tape was still around Laura's hands and mouth. (Tr. II at 274.) Petitioner walked Laura to the house and took her upstairs. (Tr. II at 275.) There was no furniture in the house. (Tr. II at 275.) Laura thought Petitioner had a key because he was remodeling the home. When they arrived upstairs, Laura noticed that three sleeping bags, two pillows, a cooler, a candle, lotion and a towel were on the floor. (Tr. II at 276.) Petitioner placed Laura on a sleeping bag and picked up a knife. (Tr. II at 277.) Petitioner put the knife to Laura's throat and slid the knife up to cut the duct tape off of her face. Petitioner then ripped off the tape along with a bunch of Laura's hair. Next, Petitioner cut the tape off of her hands. He also cut off Laura's sweater, shirt and bra. (Tr. II at 279.) Petitioner pulled off Laura's boots and pants and ripped off her underwear. (Tr. II at 280.) Petitioner immediately undressed and pushed Laura on her back, got on top of her and put his penis into her vagina. (Tr. II at 281-82.) Right after he

ejaculated, Petitioner made Laura give him oral sex by grabbing her by the back of her head and pushing her mouth onto his penis. (Tr. II at 282-83.) Next, Petitioner moved Laura over to her hands and knees and put his penis into her vagina. (Tr. II at 283.) During these three acts, the knife was located within Petitioner's arm's reach. (Tr. II at 284.) Laura mentioned that she was fearful because he had used a knife on her before. (Tr. II at 285.)

Laura then went to the downstairs bathroom. Petitioner, however, would not let her put any clothes on so she would not run away. (Tr. II at 285.) After the bathroom, Petitioner took Laura upstairs and made her give him oral sex by grabbing the back of her head and forcing her mouth onto his penis. (Tr. II at 287.) When Laura tried moving her head away from him, Petitioner pulled her hair harder. The knife was still within Petitioner's reach. (Tr. II at 294.)

At this time, Laura Horn was concerned about their 15 year old daughter, Charlotte, and wanted to call her. Laura had previously told Charlotte that she was meeting Petitioner. (Tr. II at 295-96.) Around 9:00 p.m., Petitioner called Charlotte for Laura but held the phone. (Tr. II at 296, 300.) When Charlotte answered, Laura told her that she was ok and would be home later. After the phone call, Petitioner made Laura get on her hands and knees again and entered her vagina with his penis. Laura did not participate willingly. (Tr. II at 297.) Afterwards, Petitioner rolled over and put his legs over Laura. Laura thought he was sleeping. At one point, Laura moved but Petitioner grabbed her. (Tr. II at 298.) After another bathroom break, Petitioner made Laura give him oral sex again. Laura attempted to resist but Petitioner forced Laura's head onto his penis. (Tr. II at 299.) After oral sex, Petitioner allowed Laura to call her daughter again. Laura thought it was around 1:00 a.m. Laura testified that her daughter was really upset and said that she was going to

call the police. Laura started crying. (Tr. II at 300-01.) Petitioner then took the phone away from Laura and turned it off so the police could not track her. (Tr. II at 302.)

When the sun started to come up, Petitioner began to act remorseful. He started crying and telling Laura that he was sorry. (Tr. II at 304.) Petitioner allowed Laura to call Karen Scott, the mother of Charlotte's friend. (Tr. II at 305.) Karen was on her way to a cheerleading competition. Laura asked Karen to tell Charlotte that she was ok. (Tr. II at 306.) Laura was supposed to be going to Charlotte's cheerleading competition that morning. (Tr. II at 307.)

Before they left, Petitioner asked Laura to pick up the items in the upstairs bedroom. Laura helped Petitioner carry several items back to the truck and put them in the bed of his truck. Next, Petitioner drove Laura back to Red Lobster. (Tr. II at 308.) Laura drove home, took a bath and cried. After a few hours, Charlotte came home with Karen Scott's daughter, Kalli Holmes. (Tr. II at 309.) Eventually, Laura told them what happened. (Tr. II at 310.) After this incident, Laura noticed a bruise on her neck, her shoulder was tender and she was very sore in the pelvic area. (Tr. II at 303.) Laura testified that she is scared of the dark and parking lots, has nightmares and cannot sleep. She is also in counseling. (Tr. II at 310.)

On re-direct examination, Laura testified that because Petitioner choked and assaulted her on New Year's Eve, she ended the relationship with him. She did not report that incident. (Tr. II at 399.)

Petitioner and Laura Horn's daughter, Charlotte Horn, testified that her parents separated in November or December. Charlotte chose to live with Laura. On January 27, 2006, Charlotte knew that her parents were meeting at Red Lobster. (Tr. II at 408.) Around 9:00 p.m., Charlotte called Laura on her cell phone. Charlotte wondered when her mom was coming home.

Laura replied soon and that she was at Petitioner's house. (Tr. II at 409.) Around midnight, Charlotte became concerned that her mother was not coming home. At 1:00 a.m., Charlotte received another call from her mother. When asked when she was coming home, Laura replied that she could not. (Tr. II at 411.) Charlotte became alarmed at that point. Charlotte told Laura that if she did not come home, Charlotte was going to call the police. Laura told her not to call the police. Charlotte decided not to call the police because she did not know where Laura was located. (Tr. II at 412.) Charlotte went to her cheerleading competition that morning but came home with her friend Kalli Holmes around noon. (Tr. II at 412-13.) Charlotte and Kalli found Laura upset. (Tr. II at 413-14.) Laura eventually told them what happened. Charlotte corroborated Laura's version of the events. Laura was upset and crying while telling Charlotte and Kalli what happened. (Tr. II at 416-17.) On re-direct examination, Charlotte testified that Laura quit spending time with Petitioner after New Years Eve because Petitioner raped Laura. (Tr. II at 423.)

Karen Scott testified that her daughter, Kalli Holmes, and Charlotte Horn are best friends. (July 13, 2006 Trial Tr. Vol. III (Tr. III) at 442, docket #15.) On January 28, 2006, Karen dropped off Charlotte and Kalli at school around 7:00 a.m. Both girls were upset because they could not reach Laura Horn or Petitioner. (Tr. III at 442-45.) As a result, Karen called Laura's cell phone because she was worried and Laura was supposed to ride with her to the cheerleading competition. (Tr. III at 445-46.) Laura returned the call around 8:30 a.m. Karen could tell something was wrong. Laura told Karen to let Charlotte know that she was ok and at home. (Tr. III at 446-47.)

Kalli Holmes testified that she is a friend of Charlotte Horn. On January 27, 2006, Kalli spent the night at Charlotte's house. (Tr. III at 449.) Around 9:00 p.m., they called Laura Horn, who told them not to worry about her. Laura stated that she would be home later. When she

was not home later, Charlotte and Kalli called Laura again. This time, Laura, who was crying, said not to worry and that she had to go. Kalli and Charlotte decided against calling the police and went to sleep. (Tr. III at 450.) When Laura was not home in the morning, Kalli and Charlotte kept on trying to reach her without any luck. (Tr. III at 451.) After returning to Charlotte's house, Kalli testified that Laura was hysterical and would not tell them what happened. (Tr. III at 453.) Several minutes later, Laura told Kalli and Charlotte what Petitioner had done. (Tr. III at 454.) Kalli's testimony corroborated Laura's testimony. (Tr. III at 454.)

Laura Horn and Petitioner's son, Nicholas Horn, testified that he lived with Petitioner. (Tr. III at 464.) On January 28, 2006, Nicholas was called to Laura's house. Laura and his sister, Charlotte Horn, were at the house. (Tr. III at 465.) Nicholas testified that his mother was shaking and crying. Laura told Nicholas that Petitioner kidnapped and raped her and threatened to kill her. (Tr. III at 466.) Nicholas also corroborated Laura's version of the events. (Tr. III at 466-67.) Nicholas insisted that Laura call the police. (Tr. III at 467.) After Laura called the police, Nicholas went to Petitioner's house to grab a few things. (Tr. III at 467-68.) Nicholas also eventually took the pants Petitioner wore that night. Nicholas noted that the pants had scuff marks and shoe prints all over the legs. (Tr. III at 467.)

Portage Police Officer Gregory Burke testified that he went to 1024 Reed Street in Kalamazoo County on January 28, 2006, to assist Detectives Larry Napp and Ronald Petroski gather evidence pursuant to a search warrant. (Tr. III at 480-82, 495.) Burke stated that he found green fibers on the downstairs bathroom floor, the stairs and in the upstairs bedroom. (Tr. III at 483.) Burke also obtained a palm print from the bathroom, which was later identified as Petitioner's print. (Tr. III at 490.) Burke then searched a green Ford pick-up truck owned by Petitioner. (Tr.

III at 488.)  Burke seized several items from the back of the truck including a cooler, a bluish-green sweater, a towel, a sleeping bag, a cord, and duct tape with strands of human hair.  (Tr. III at 491-94.)

Michigan Department of State Police Officer Kevin Streeter testified that he is employed at the Grand Rapids Forensic Laboratory.  Streeter testified as an expert in scientific analysis of crime scene evidence.  (Tr. III at 505-06.)  Streeter compared evidence obtained from the crime scene to known evidence, including a sweater, a bra and underwear.  (Tr. III at 508-11.)  In Streeter's opinion, the bluish-green fibers from the crime scene compared both in chemical and physical properties to the sweater.  Also, Streeter found that unknown fibers compared both in chemical and physical properties to the underwear. (Tr. III at 511-13.)  A bluish fiber removed from the duct tape compared both in chemical and physical properties with the sweater.  (Tr. III at 520.)

Michigan State Police Forensic Scientist Sarah Thibault testified as an expert in DNA testing and analysis.  (Tr. III at 525-26.)  Thibault testified that she tested buccal and cervical swabs of Laura Horn and two hairs collected from the duct tape.  (Tr. III at 527.)  As a result of the testing, Thibault found that the DNA profile from the hair sample matched Laura's DNA profile.  (Tr. III at 530-32.)  On re-direct examination, Thibault testified that she was not able to compare the DNA sample from the cervical swab to any male samples that were submitted before trial.  (Tr. III at 539.)

Nurse Laurie Sweet testified that she performed Laura Horn's rape kit on January 28, 2006, as a part of the YWCA sexual assault program.  (Tr. III at 544.)  When Sweet examined Laura, she found injuries on Laura's neck, right shoulder and genitals.  (Tr. III at 545.)  In her report, Sweet corroborated Laura's version of the sexual assault.  (Tr. III at 547-48.)  On re-direct examination, Sweet clarified that Laura's injuries were consistent with non-consensual sex.  (Tr. III at 554.)

City of Portage Detective Larry Napp testified that he interviewed Laura Horn with Detective Ronald Petroski at Laura's residence on January 28, 2006. (Tr. III at 559-60.) During the interview, Laura stated that they may find material from her sweater scattered on the floor of an abandoned house because her sweater was cut off with a knife. Napp also observed a red mark on Laura's neck. Laura stated that sleeping bags, pillows and other items could be found in the back of a pick-up truck. (Tr. III at 561-62.)

When Napp and Petroski went to look at the pick-up truck, Napp shined his flashlight in the pick-up truck and found sleeping bags, a cooler and duct tape. They placed Petitioner under arrest and towed the pick-up truck to the police station. (Tr. III at 565-67.) Once those items were secured, Officer Gregory Burke, Napp and Petroski proceeded to the Reed Street house. (Tr. III at 568.) They found the house vacant but it looked like it had just been remodeled. (Tr. III at 570.) In an upstairs attic room, Napp found some blue fuzzy material. (Tr. III at 571-72.) Later, Napp examined the sleeping bags recovered from the pick-up truck. (Tr. III at 585.) Napp found blue-greenish fibers on the sleeping bags. (Tr. III at 586.)

City of Portage Detective Ronald Petroski testified that he interviewed Laura Horn on January 28, 2006. (Tr. III at 593.) Petroski went with Laura to the YWCA. (Tr. III at 597-98.) Petroski obtained the rape kit after the YWCA examination. (Tr. III at 599.) While searching the pick-up truck, Petroski shined his flashlight in the truck's window and noticed a turquoise-colored sweater, sleeping bags, knife and duct tape in the back of the truck. (Tr. III at 601-04.) When he later examined the duct tape, Petroski found hairs in the tape. (Tr. III at 603-04.) Petroski also reviewed DNA evidence from the rape kit. The initial results were that some of the DNA was not Laura Horn's DNA. (Tr. III at 604-05.)

Petitioner's brother, Chris Horn, testified first for the defense. (Tr. III at 617-18.) Chris stated that Petitioner suffered a stroke in the fall of 2005 and was paralyzed on his right side. (Tr. III at 618-19.) Apparently, Petitioner was still able to work as a carpenter but had a difficult time lifting things. (Tr. III at 619-20.) In Horn's opinion, Laura Horn is a liar. (Tr. III at 621.)

Petitioner's godson, Christopher Ewert, testified that he worked with Petitioner in construction. In the fall of 2005, Petitioner was in the hospital. (Tr. III at 623-24.) Christopher stated that Petitioner was still weak and sick in January 2006. (Tr. III at 625.) Christopher testified that Petitioner and Laura Horn talked a lot on the phone between November and January 2006. He would also find Laura's car at Petitioner's home. (Tr. III at 626.) On January 27, 2006, Christopher called around 8 p.m. to see if he could borrow tools from Petitioner. (Tr. III at 626-29.) Christopher did not notice that Petitioner was agitated or excited. (Tr. III at 629-30.)

Petitioner's friend, Clarence Ewert, testified that he saw Petitioner daily. (Tr. III at 643.) After Petitioner and Laura Horn separated in November 2005, he saw Laura Horn at Petitioner's home several times. (Tr. III at 643-45.) On New Year's Eve, Clarence spent part of the evening with Laura and Petitioner, but he left when they became romantic. (Tr. III at 645-46.) Clarence stated that he called Laura after the incident and she talked about needing money because her phone was going to be shut off. Clarence also mentioned that Laura said she had multiple orgasms on the night in question. (Tr. III at 647.)

Petitioner's mother, Barbara Horn, testified that in November 2005 Petitioner tried to commit suicide and had a stroke. Because of the stroke, Petitioner had difficulty using his right arm and leg. (Tr. III at 647, 652.) By the end of January, Petitioner had not yet fully recovered from the stroke. (Tr. III at 652.) Barbara also testified that Laura Horn was a liar. (Tr. III at 653.)

Petitioner's sister, Lorie Wellington, testified that during Petitioner's and Laura Horn's eighteen year marriage, she was close to Laura. (Tr. III at 656, 658.) Lorie, however, thought Laura was a liar. (Tr. III at 658-59.)

Billie Smith, an acquaintance of Petitioner, testified that Petitioner is an honest family man. (Tr. III at 666.) On cross-examination, the prosecutor asked whether Smith's opinion would change upon knowing that Petitioner was convicted of felonious assault in November 2005 against Laura Horn or that he was found guilty of attempted solicitation to commit murder against Laura Horn in March 2006. (Tr. III at 667-69.) Billie testified that those convictions would not change her opinion. (Tr. III at 669.)

Petitioner testified that he was married to Laura Horn for eighteen years. They have two children, Nicholas and Charlotte. (July 14, 2006 Trial Tr. Vol. IV (Tr. IV) at 689, docket #16.) When they first separated in November 2005, Laura had a personal protection order against Petitioner. Petitioner testified that Laura called to tell him that she loved him and wanted to meet him. (Tr. IV at 690.) They eventually started to see each other and talk on a regular basis. (Tr. IV at 691-92.) On January 27, 2006, they met at Red Lobster to celebrate their birthdays. (Tr. IV at 693-94.) Petitioner parked in the back of Red Lobster. (Tr. IV at 695.) Laura came a few minutes later and parked next to Petitioner. (Tr. IV at 696.) After dinner, Petitioner testified that they walked hand in hand out to the parking lot. Petitioner then transferred starter logs, matches and bird seed to Laura's car. (Tr. IV at 697-99.) Petitioner stated that Laura told him that she wanted to give him his birthday present. Laura then got into the passenger seat of his car. (Tr. IV at 699.) Laura asked Petitioner if there was any quiet place to go so no one would know. (Tr. IV at 700-01.) Petitioner headed to a house on Reed Street. (Tr. IV at 701.) First, they stopped at a gas station for

cigarettes and Tic-Tacs. (Tr. IV at 701-02.) Because Petitioner had just remodeled the house, Petitioner showed Laura the inside of the house. When they went upstairs, Laura noticed sleeping bags on the floor. Laura asked Petitioner to make love to her. They had vaginal intercourse. (Tr. IV at 704-06.)

After they both climaxed, they lay side-by-side on the sleeping bags. Laura asked Petitioner for a drink. Because the house was empty, Petitioner went to his truck to look for a mug. (Tr. IV at 706.) When Petitioner was half-way down the stairs, Laura asked Petitioner if there was anything he had for bondage. Petitioner found duct tape in his truck. (Tr. IV at 706-08.) Petitioner said he wanted to go first. Laura then wrapped tape around one of his arms to the other arm. Then Laura took his shoes, pants and underwear off. (Tr. IV at 709.) Laura put her turquoise-colored sweater over Petitioner's face so he could not see what was going on. Laura performed oral sex on Petitioner, and, then, had vaginal intercourse with him. (Tr. IV at 710.) Laura attempted to take the duct tape off of Petitioner's hands but she needed help with a knife. (Tr. IV at 711.)

Petitioner testified that Laura also wanted to be restrained with the duct tape. Petitioner performed oral sex on her and then vaginal intercourse. During this encounter, Laura told Plaintiff to get a little rough with her so he smacked her on the buttocks a couple of times. Petitioner also tore her white shirt. When it was over, Petitioner cut the duct tape off of Laura. (Tr. IV at 712-13.) Petitioner testified that they had intercourse two more times that night and oral sex. (Tr. IV at 715.) Around 3:30 a.m., Laura said she was ready to go but Petitioner convinced her to stay longer. (Tr. IV at 716.) At 7:00 a.m., they woke up. Petitioner smoked a cigarette and walked in on Laura smoking something on foil in the bathroom. (Tr. IV at 717.) They argued. Petitioner threatened to stop giving Laura money, to obtain custody of their daughter and to let her daycare

- 14 -

parents know why she lost her license. Laura went upstairs, put her clothes on and picked up a sleeping bag. Petitioner took the remaining sleeping bags and the cooler downstairs. (Tr. IV at 717-18.) Laura also wadded up the duct tape and brought it to the truck. (Tr. IV at 719.) Laura placed the duct tape, candle and cigarette butts in the cooler. Petitioner drove her back to her car. (Tr. IV at 720.)

Petitioner testified that he had a stroke in November 2005. As of January 2006, he was still experiencing weakness from the stroke. (Tr. IV at 722-23.) Petitioner denied having a knife by the sleeping bags or forcefully placing Laura in the back of the truck and tying her up. (Tr. IV at 723-24.) Petitioner also testified that Laura's bra, sweater and purple thong was intact when Laura left. (Tr. IV at 724.)

On cross-examination, Petitioner testified that he pled guilty to felonious assault on November 23, 2005. Petitioner had a knife during that incident. Laura obtained a personal protection order against Petitioner after that incident. (Tr. IV at 733.)

On rebuttal, County of Kalamazoo Assistant Prosecuting Attorney Christine Bourgeois and Kalamazoo County Victim Advocate Gloria Swinsick testified that Laura Horn did not indicate that she had an orgasm during the encounter with Petitioner. (Tr. IV at 749-51, 756.)

Laura Horn testified on rebuttal that she had never participated in any type of bondage with Petitioner nor had she ever smoked anything from tin foil. (Tr. IV at 760-61.) Laura testified that she never told anyone of the prosecutors that she had an orgasm during the encounter with Petitioner. (Tr. IV at 761.)

Nicholas Horn testified that Petitioner had fully recovered from his weakness on his right side by January 2006. (Tr. IV at 766.)

At the conclusion of the trial, on July 17, 2006, the jury found Petitioner guilty of kidnapping and four counts of first-degree criminal sexual conduct. (July 17, 2006 Trial Tr. Vol. V (Tr. V) at 849-50, docket #17.) On September 11, 2006, Petitioner's sentencing was adjourned. (Sept. 11, 2006 Sentencing Tr., 4, docket #18.) On October 2, 2006, Petitioner was sentenced as a second habitual offender to serve concurrent terms of 40 to 60 years for each conviction. (Sept. 11, 2006 Sentencing Tr., 25-26, docket #19.)

### B.     Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief on appeal raised the following three claims:

I.      THE PROSECUTOR COMMITTED MISCONDUCT BY MAKING A SPECIFIC REFERENCE TO AN UNNOTICED PRIOR BAD ACT WHICH WAS PRECLUDED BY A TRIAL COURT RULING AND CAUSED SIGNIFICANT PREJUDICE TO THE [PETITIONER] WHICH WARRANTED RELIEF IN THE FORM OF A MISTRIAL.

II.     THE [PETITIONER'S] STATE AND FEDERAL CONSTITUTIONAL RIGHTS WERE VIOLATED WHERE HE WAS PHYSICALLY RESTRAINED BY LEG SHACKLES THROUGHOUT THE TRIAL WITHOUT ANY SHOWING OF THE NECESSITY FOR SUCH RESTRAINTS.

III.    THE SENTENCE OF 40-60 YEARS IN PRISON FOR THE CRIMES OF KIDNAPPING AND CRIMINAL SEXUAL CONDUCT REPRESENT A SIGNIFICANT UPWARD DEPARTURE FROM THE LEGISLATIVE SENTENCING [GUIDELINES] WITHOUT SUBSTANTIAL AND COMPELLING REASONS FOR A DEPARTURE.

(*See* Def.-Appellant's Br. on Appeal, docket #22.) Petitioner also filed a supplemental brief on appeal raising the following two issues:

I.      [PETITIONER] WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHERE COUNSEL FAILED TO MEET WITH HIM PRIOR TO TRIAL. IN THIS REGARD

[PETITIONER'S] CLAIM OF INEFFECTIVE ASSISTANCE IS ENTITLED TO A PRESUMPTION OF PREJUDICE WHERE THE PRETRIAL PERIOD CONSTITUTES A "CRITICAL STAGE" OF THE CRIMINAL PROCEEDINGS. NOTWITHSTANDING THIS, DEFENSE COUNSEL'S DEFICIENT PERFORMANCE SO PREJUDICED THE DEFENSE AS TO DEPRIVE DEFENDANTS OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL.

II.      [PETITIONER] IS ENTITLED TO REMAND FOR AN EVIDENTIARY HEARING ON HIS CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL [AND SO] THAT DEFENDANT MAY FILE A MOTION FOR A NEW TRIAL BASED ON THE VERDICT IN THIS CASE BEING AGAINST THE GREAT WEIGHT OF THE EVIDENCE.

(*See* Def.-Appellant's Pro Per Supplemental Br., docket #22.) In a published opinion issued on May 15, 2008, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (*See* May 12, 2005 Mich. Ct. App. Opinion (MCOA Op.), docket #22.)

      Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court raising the same claims. (*See* Pro Per Appl. for Leave to Appeal, docket #23.) By order entered October 27, 2008, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Oct. 27, 2008 Mich. Order, docket #23.)

### C.      Post-Conviction Relief

      Petitioner filed a motion for relief from judgment in the Kalamazoo County Circuit Court raising the following five issues and subissues:

I.      DID THE PROSECUTOR COMMIT REVERSIBLE ERROR WHEN HE ENGAGED IN PROSECUTORIAL MISCONDUCT [BY (A) INTRODUCING UNNOTICED 404(B) EVIDENCE THROUGH LAURA HORN, (B) VOUCHING FOR THE CREDIBILITY OF WITNESSES DURING HIS CLOSING ARGUMENT, (C) BRINGING THAT DEFENDANT WAS CONVICTED OF "ATTEMPTED SOLICITATION OF THE MURDER OF LAURA HORN" TO THE JURY'S ATTENTION AND (D) ARGUING IN CLOSING ARGUMENTS

THAT THERE WERE PRIOR BAD ACTS BY PETITIONER AGAINST LAURA HORN]?

II.     DID THE PROSECUTOR COMMIT REVERSIBLE ERROR WHEN HE USED "BAD MAN" EVIDENCE TO CONVICT [PETITIONER]?

III.    DID THE TRIAL COURT LACK SUBJECT MATTER JURISDICTION WHEN IT BROUGHT CHARGES AGAINST [PETITIONER]?

IV.    WAS [PETITIONER] DEPRIVED OF THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL [BY (A) FAILING TO INTRODUCE UNNOTICED 404(B) EVIDENCE THROUGH LAURA HORN, (B) VOUCHING FOR THE CREDIBILITY OF WITNESSES DURING HIS CLOSING ARGUMENT, (C) BRINGING THAT DEFENDANT WAS CONVICTED OF "ATTEMPTED SOLICITATION OF THE MURDER OF LAURA HORN" TO THE JURY'S ATTENTION AND (D) BY ARGUING IN CLOSING ARGUMENTS THAT THERE WERE PRIOR BAD ACTS BY PETITIONER AGAINST LAURA HORN]?

V.     WAS [PETITIONER] DEPRIVED OF THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL?

(*See* Def.-Appellant's Br., docket #21.)  On October 13, 2009, the Muskegon County Circuit Court denied Petitioner's motion because Petitioner failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D).  (Oct. 13, 2009 Op. & Order, docket #24.)  Petitioner filed a delayed application for leave to appeal to the Michigan Court of Appeals, raising the five issues and subissues in his motion for relief from judgment.  On December 23, 2009, the Michigan Court of Appeals denied leave to appeal on the grounds that Petitioner had failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D).  (Dec. 23, 2009 Mich. Ct. of Appeals' Order, docket #24.)  The Michigan Supreme Court denied leave to appeal for the same reason on June 28, 2010.  (June 28, 2010 Mich. Order, docket #25.)

## II.  <u>Standard of Review</u>

This action is governed by the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are

materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410.

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington v. Richter*, — U.S. —, 131 S. Ct. 770, 784 (2011); *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Richter* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption

arguably might be overcome); *see also Richter*, 131 S. Ct. at 785 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

### A.      Exhaustion & Procedural Default

### 1.      Claims I(E), III(E), III(M) and IV

Before the Court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim. *See O'Sullivan*, 526 U.S. at 842; *Picard v. Connor*, 404 U.S. 270, 275-77 (1971) (cited by *Duncan v. Henry*, 513 U.S. 364, 365 (1995), and *Anderson v. Harless*, 459 U.S. 4, 6 (1982)). To fulfill the exhaustion requirement, a petitioner must have fairly presented his federal claims to all levels of the state appellate system, including the state's highest court. *Duncan*, 513

U.S. at 365-66; *Silverburg v. Evitts*, 993 F.2d 124, 126 (6th Cir. 1993); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990). "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845.

Petitioner did not attempt to exhaust Claims I(E), III(E), III(M), and IV on direct appeal or in his motion for relief from judgment. Exhaustion is a problem, however, only if there remains a state court remedy available for a petitioner to pursue, thus providing the state courts with an opportunity to cure any constitutional infirmities in the state-court conviction. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). If no further state remedy is available to the petitioner, exhaustion does not present a problem, but the federal court must determine whether cause and prejudice exists to excuse the failure to present the claim in state court. *Id.*; *Cone v. Bell*, 243 F.3d 961, 966 (6th Cir. 2001) ("If the claim presented in the federal court were never actually presented in the state courts, but a state procedural rule now prohibits the state court from considering them, the claims are considered exhausted, but are procedurally barred.") (citing *Coleman v. Thompson*, 501 U.S. 722, 752-53, *rev'd on other grounds*, 535 U.S. 635 (2002)).

In the instant case, no further state-court remedy remains available to Petitioner. Generally, a prisoner may file only one motion for relief from judgment, MICH. CT. R. 6.508(D), and exceptions to this rule exist only for motions based on a retroactive change in the law or on a claim of newly discovered evidence.[1]  *See* MICH. CT. R. 6.502(G)(2).  Petitioner has already filed one

---

[1]In his brief in support of his habeas application, Petitioner notes that his newly discovered evidence in Claim VII could not be brought in a successive motion for relief from judgment because all of the "new" evidence was "discovered before Petitioner's first post-conviction motion for relief from judgment" and could have been disclosed through discovery prior to trial. (Pet'r's Br. in Support of Pet., docket #2, Page ID##88-89.)  Instead, Petitioner argues that the newly discovered evidence in Claim VII is raised to avoid procedural default.  (*Id.* at Page ID#90.)

motion for relief from judgment. Moreover, his claims are not based on a retroactive change in the law or on newly discovered evidence. Consequently, his claims do not fall within either of the exceptions to MICH. CT. R. 6.502(G)(2), and he no longer has a state remedy to exhaust. Because he does not have an available remedy in the state courts, his claims are considered exhausted, but are procedurally defaulted. *See Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013).

If a petitioner procedurally defaulted his federal claims in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks v. Straub*, 377 F.3d 538, 551-52 (6th Cir. 2004). The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Petitioner has not attempted to argue cause and prejudice to excuse his failure to present claims I(E), III(E), and III(M) either on direct appeal or on collateral review. However, Petitioner contends that the ineffective assistance of counsel serves as cause excusing his procedural default of ground IV. Specifically, Petitioner contends that counsel was ineffective in failing to file a motion for a new trial on the basis that the verdict was against the great weight of the evidence. Because Petitioner has raised the ineffective assistance of counsel claim in an independent and

meritless ground for habeas relief (ground III(K)), the Court will address that issue during its discussion of Petitioner's claims of ineffective assistance of trial counsel in Part III(C)(5) of this report and recommendation. It suffices at this juncture to note that Petitioner has failed to demonstrate either that counsel was ineffective or that he was prejudiced by the failure to file a motion to remand.

Petitioner next seeks to excuse his procedural default by claiming that newly discovered evidence of actual innocence is sufficient to overcome the procedural bar. Having failed to allege or demonstrate cause and prejudice excusing his default, Petitioner argues that Nurse Laurie Sweet's January 28, 2006 Medical Forensic Examination Report should have been presented to the jury because the report showed an answer of "none" for the question of "weapon use." (Pet'r's Br. in Supp., docket #2, Page ID##89, 160.) Further, according to Sweet's report, Laura Horn stated that Petitioner "had a knife" but "I didn't feel like he was threatening me with it . . . ." (*Id.* at Page ID#166.) Petitioner also claims that Doctor David Boersma's March 2, 2006 Forensic Evaluation Report would have bolstered Petitioner's testimony at trial because the report would have shown that Petitioner's testimony had not changed from March to his trial in July, 2006, and, thus, contradict any allegations that Petitioner attempted to "make up a story to fit the evidence." (*Id.* at Page ID#168.)

Petitioner has not demonstrated that manifest injustice would result because he has not made a colorable claim of innocence. Petitioner has not shown that any constitutional error "probably" resulted in the conviction of one who was actually innocent. *Schlup*, 513 U.S. at 322 (citing *Murray*, 477 U.S. at 495). As stated by the Supreme Court:

> Federal courts are not forums in which to relitigate state trials. The guilt or innocence determination in state criminal trials is a decisive and portentous event.

Society's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens. Few rulings would be more disruptive of our federal system than to provide for federal habeas review of freestanding claims of actual innocence.

*Herrera v. Collins*, 506 U.S. 390, 401 (1993) (quotations omitted). To demonstrate actual innocence, Petitioner must show that, in light of new evidence, no factfinder, acting reasonably, would have voted to find him guilty beyond a reasonable doubt. *Coleman v. Mitchell*, 244 F.3d 533, 540 (6th Cir. 2001) (citing *Schlup*, 513 U.S. at 329).

To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eye witness accounts, or critical physical evidence -- that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful.

*Schlup*, 513 U.S. at 324. Because both reports were dated prior to the trial and could have easily been subject to discovery before trial, Petitioner has not provided any new evidence to support his innocence claim.

In summary, Petitioner has failed to demonstrate cause and prejudice for the procedural default of Claims I(E), III(E), III(M), and IV, or to demonstrate actual innocence of his convictions, and, thus, Claims I(E), III(E), III(M), and IV are not reviewable by this Court.

## 2. Claims I(A), I(B), I(C), III(A), III(B), III(C) and V

Respondent contends that Claims I(A), I(B), I(C), III(A), III(B), III(C) and V are procedurally defaulted. (Respondent's Answer, 11–20, docket #9.) When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to

comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks,* 377 F.3d at 551; *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

As previously discussed, when a petitioner procedurally defaults a federal claim in state court, the petitioner must demonstrate either cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim. *See House*, 547 U.S. at 536; *Murray*, 477 U.S. at 495; *Hicks*, 377 F.3d at 551-52. In the alternative, the petitioner must show that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *Id.*

### a.     Claim I(A)

In Claim I(A), Petitioner contends that the prosecutor wrongfully introduced prior bad acts evidence through the testimony of Petitioner's daughter, Charlotte Horn. On re-direct examination, the prosecutor asked Charlotte: "Did - [a]fter New Year's Eve - if you know - did [Laura Horn] quit spending time alone with [Petitioner]?" (Tr. II at 423.) Charlotte replied "Yeah." (*Id.*) The prosecutor then asked "Okay. Do you know why?" (*Id.*) Charlotte replied "Because he raped her." (*Id.*)[2]  Petitioner raised his claim on direct appeal, but the Michigan Court of Appeals found the issue unpreserved for appellate review because Petitioner did not object to the prosecutor's

---

[2]Petitioner was not being tried for any alleged New Year's Eve sexual assault of Laura Horn in this trial.

examination of Charlotte. Applying a limited review for unpreserved error, the court concluded that Petitioner failed to show a plain error that affected his substantial rights. The court of appeals stated:

> At trial, the prosecutor asked defendant's daughter, Charlotte, whether she knew why LH [Laura Horn] had stopped seeing defendant in December 2005 and Charlotte replied that it was because defendant had raped LH. Defendant complains that the prosecutor's question elicited testimony about other acts without the provision of notice as required by MRE 404(b)(2).[1]

> We reject defendant's argument because defense counsel opened the door to the evidence and, therefore, the prosecutor's question was not improper. *People v Verburg*, 170 Mich App 490, 498, 430 NW2d 775 (1988). Before Charlotte testified, defense counsel asked LH about her relationship with defendant between November 2005 and, specifically, about when she had met defendant in private places. LH testified, without objection, that she stopped seeing defendant in private places after he sexually assaulted her in December 2005. Thus, defense counsel had already elicited testimony about this issue and it was reasonable for the prosecutor to believe that defense counsel opened the door for his question to Charlotte about whether she knew why LH had stopped seeing defendant in December 2005. *Id.*; *People v Noble*, 238 Mich App 647, 660, 608 NW2d 123 (1999).

> Were we to conclude that the prosecutor improperly elicited Charlotte's testimony, we would nonetheless hold that the trial court correctly denied defendant's motion for a mistrial. A trial court should only grant a mistrial when the prejudicial effect of the error cannot be removed in any other way. *People v Lumsden*, 168 Mich App 286, 299, 423 NW2d 645 (1988). The trial court instructed the jury on the proper use of the other-acts evidence, and instructions are presumed to cure most errors. *People v Abraham*, 256 Mich App 265, 279, 662 NW2d 836 (2003). Defendant has failed to establish that the trial court's instructions were insufficient to cure any alleged unfair prejudice. Moreover, a mistrial would have been inappropriate because, as discussed, LH had already testified about defendant's prior sexual assault and Charlotte's testimony was merely cumulative of LH's testimony.

> [1]Defendant did not preserve this claim of prosecutorial misconduct, so we review it for plain error affecting defendant's substantial rights. *People v Watson*, 245 Mich App 572, 586, 629 NW2d 411 (2001). Defendant also claims that the trial court erred when it denied his motion for a mistrial based on the prosecutor's questioning of Charlotte. We review this issue for an abuse of discretion. *People v Bauder*, 269 Mich App 174, 194, 712 NW2d 506 (2005). A trial court abuses its discretion when it fails to select a principled outcome. *People v Babcock*, 469 Mich 247, 269, 666 NW2d 231 (2003).

(MCOA Op. at 2-3.)[3]

Respondent contends that Petitioner's claim is procedurally defaulted because it was not preserved by Petitioner's attorney through a contemporaneous objection. (Respondent's Answer, 11–15, docket #9.) The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim.[4] It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial. *See People v. Kelly*, 423 Mich. 261, 271 (1985). A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee*, 534 U.S. at 385. Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claim in state court. *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996). The court of appeals' subsequent review of the issue did not waive the procedural default because it was a separate and alternative holding apart from the determination of the procedural default. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991); *Paprocki v. Foltz*, 869 F.2d 281, 285 (6th Cir. 1989). Accordingly, review by

---

[3]Petitioner argues that *defense counsel* did not question Laura Horn regarding any sexual assault on New Year's Eve. (Pet'r's Response, docket #27, Page ID#329.) The *prosecutor* questioned Laura about the incident on re-direct examination. (Tr. II at 399.) Laura testified that Petitioner assaulted her on New Year's Eve. (*Id.*) Regardless, the result is still the same. Petitioner's claim is still procedurally defaulted.

[4]Further, where, as here, a state court has invoked the procedural rule, the mere fact that the court subsequently reviews a petitioner's claim for plain error "does not constitute a waiver of state procedural default rules." *Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000) (citations omitted); *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir. 2000); *see also Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (state court's alternative holding on the merits does not require federal court to disregard the procedural bar); *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991) (same); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989) (claim is defaulted even where the state court may excuse the default for "manifest injustice"); *Federico v. Yukins*, No. 93-2424, 1994 WL 601408, at **3-4 (6th Cir. Nov. 2, 1994) (same, for "miscarriage of justice").

this Court is barred unless Petitioner can show cause and prejudice. *House,* 547 U.S. at 536; *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray*, 477 U.S. at 485.

To show cause, Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal. *Murray*, 477 U.S. at 488; *see also McCleskey v. Zant*, 499 U.S. 467, 497 (1991). Petitioner asserts in Claim III(A) that his trial counsel was ineffective for failing to object to the prosecutor's questioning of Charlotte Horn. To serve as cause to excuse the default, a claim of ineffective assistance of counsel must be properly exhausted. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001); *Coleman*, 244 F.3d at 538. Petitioner raised his claim of ineffective assistance of counsel in his motion for relief from judgment and in all levels of appellate review; thus, the claim was exhausted. In order to excuse his default, Petitioner must show that his counsel's failure to raise an objection rose to the level of a constitutional violation under *Strickland v. Washington*, 466 U.S. 668 (1984); *see also McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004).

In *Strickland*, 466 U.S. at 687-88, the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.

*Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).

The Kalamazoo County Circuit Court found that Petitioner's trial counsel was not ineffective for failing to object to Charlotte Horn's testimony because defense counsel moved for a mistrial. The trial court stated:

> Instead of objecting to the testimony of Charlotte Horn, Trial Counsel moved for a mistrial following her testimony. The Court did not grant the mistrial, but did read a limiting instruction explaining the proper use of Charlotte Horn's testimony. It is improper for the Court to second-guess counsel on matters of trial strategy, and the Court will not assess counsel's competence with the benefit of hindsight. *See People v. Rice (on Remand)*, 235 Mich App 429, 445 (1999). Further, an unfavorable result is not enough to demonstrate ineffective assistance of counsel. *See People v. Grant*, 470 Mich 477, 497 (2004).

(Oct. 13, 2009 Op. & Order, 8-9, docket #24.)

The Michigan Court of Appeals found that Petitioner's trial counsel satisfied the performance prong of *Strickland*. With regard to the performance prong of the inquiry, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687-88. Judicial scrutiny of performance is highly deferential, and "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Therefore, this Court should judge whether, in light of all the circumstances viewed at the time of counsel's conduct, counsel's "acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690.

The appellate court found that it was a strategic decision of trial counsel not to object to Charlotte Horn's testimony but instead to request a motion for mistrial at the end of her testimony.

Counsel may have considered that making an objection in front of the jury would have drawn more attention to Charlotte's testimony. Petitioner's counsel therefore could have strategically decided that waiting and moving for a mistrial outside of the presence of the jury was a better choice. Even though the motion for mistrial was ultimately unsuccessful, the fact that the strategy was not successful does not amount to ineffective assistance. *See Hamilton v. Jackson*, 416 F. App'x 501, 508 (6th Cir. 2011). Moreover, defense counsel successfully argued to have the trial court issue a jury instruction regarding Charlotte Horn's testimony. The trial court instructed the jury regarding Charlotte Horn's testimony at the start of the next day of the trial and at the end of the trial. (Tr. III at 440-41; Tr. IV at 818-19.) Although defense counsel did not get the ruling on the motion that he was hoping for, counsel worked aggressively and diligently to obtain the best possible outcome for his client on the matter.

Because counsel's performance was not ineffective, Petitioner cannot show cause for his default. Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985). Regardless, Petitioner cannot show prejudice for his default. Prejudice requires the Petitioner to show that the alleged error "worked to his *actual* and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). "'[T]he prejudice component of the cause and prejudice test is not satisfied if there is strong evidence of Petitioner's guilt and a lack of evidence to support his claim.'" *Perkins*, 58 F.3d at 219 (quoting *Rust*, 17 F.3d at 161-62). Petitioner cannot show prejudice because, as stated in Section III(A), there was strong evidence against him. Moreover, as the Court previously concluded, Petitioner has failed to present any new evidence to support a claim of actual innocence

in Claim VII. Accordingly, Petitioner's claim is procedurally defaulted and may not be reviewed by this Court.

### b. Claims I(B), I(C), III(B), III(C) and V

Petitioner raised Claims I(B), I(C), III(B), III(C) and V for the first time in his motion for relief from judgment. In Claim I(B) Petitioner argues that the prosecutor wrongfully asked Laura Horn, "what happened on New Year's Eve?" Laura replied that "[Petitioner choked me and forced [himself] sexually on me again at his house." (Tr. II at 399.) In Claim I(C), Petitioner argues that the prosecutor wrongfully introduced prior bad acts in response to character evidence by Billie Smith. The prosecutor asked Billie Smith if her opinion as to the truthfulness of Petitioner would change if she knew that Petitioner was found guilty of attempted solicitation to commit murder against Laura Horn or if she learned that Petitioner was convicted of felonious assault against Laura Horn in November 2005. (Tr. III at 667-69.) In Claims III(B) and III(C), Petitioner asserts that trial counsel was ineffective for failing to object to the prosecutorial misconduct in Claims I(B) and I(C). In Claim V, Petitioner argues that trial counsel was ineffective for failing to argue that the trial court lacked subject matter jurisdiction. The Court notes that in Claim VI, Petitioner raises ineffective assistance of appellate counsel as cause to overcome the procedural bar for failing to raise Claims I(B), I(C), III(B), III(C) and V on direct appeal.

In his answer, Respondent argues that Claims I(B), I(C), III(B), III(C) and V are procedurally defaulted. (Respondent's Answer, 16–20, docket #9.) As previously stated, the doctrine of procedural default is applicable where a petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "adequate and independent." *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). Petitioner violated MICH.

CT. R. 6.508(D) by failing to raise his claims on direct appeal and by asserting the claims for the first time in his motion for relief from judgment and subsequent appeals. Thus, the first element of procedural default is satisfied.

To determine whether a petitioner has been denied relief based on a procedural default, we look to the last "reasoned judgment rejecting the [federal] claim." *Ylst*, 501 U.S. at 803. The doctrine is applicable if "the last state court to review [the prisoner's] conviction 'clearly and expressly' relied on [the prisoner's] procedural default in its decision affirming Petitioner's conviction." *Rust*, 17 F.3d at 161. The Sixth Circuit has held that the brief form orders such as those issued by the Michigan appellate courts in Petitioner's case do *not* invoke a procedural default. In *Guilmette v. Howes*, 624 F.3d 286, 289-90 (6th Cir. 2010), the Sixth Circuit, in an *en banc* decision, held that brief form orders by the Michigan appellate courts invoking MICH. CT. R. 6.508(D) are unexplained orders within the meaning of *Ylst*, 501 U.S. at 803. Such form orders are presumed to uphold or reject the last reasoned decision below. *Guilmette*, 624 F.3d at 291-92 (citing *Ylst*, 501 U.S. at 803). As a result, absent an explained decision from a lower Michigan court applying the procedural prohibition of MICH. CT. R. 6.508(D), the federal court may not invoke procedural default to dispose of a habeas claim that has been rejected by the Michigan courts on the grounds of MICH. CT. R. 6.508(D). In *Amos v. Renico*, 683 F.3d 720, 727 (6th Cir. 2012), the Sixth Circuit recognized that its decision in *Guilmette* overturned the prior law of the circuit which held that an appellate court's invocation of MICH. CT. R. 6.508(D) amounted to an express reliance on a procedural default.

Thus, in Petitioner's case, the Court must look to the decision of the trial court to determine whether it invoked a procedural bar to reject Petitioner's claims. *See Ylst*, 501 U.S. at

803. It did. The trial court denied Petitioner's motion for relief from judgment because Petitioner failed to show good cause under MICH. CT. R. 6.508(D)(3), stating:[5]

> Pursuant to M.C.R. 6.508(D), in a Motion for Relief from Judgment, a defendant must demonstrate good cause for failing to raise the issues in the motion on appeal and actual prejudice for the alleged irregularities. Good cause can be established by showing (1) a significant possibility the defendant is innocent; (2) some objective factor external to the defense impeded efforts to comply with the procedural rules; or (3) ineffective assistance of counsel. *People v. Reed*, 449 Mich. 375, 378-379 (1985) . . . .

> The Defendant cannot show that his Trial Counsel's handling of testimony of "other acts" evidence fell below an objective standard of reasonableness. The testimony of Laura Horn was properly admitted because it was relevant to the Defendant's contention that the sexual encounter between him and Laura Horn was consensual. Counsel is not ineffective if he fails to make a futile objection. *People v. Fike*, 228 Mich App 178, 182 (1998) . . . .

> The Defendant also has not shown that his Appellate Counsel was ineffective. Appellate counsel does not need to raise every possible appellate claim, and may be selective as a matter of discretion and strategy when choosing which meritorious issues to raise on appeal. *People v. Reed*, 449 Mich. 375, 397 (1996). Since Defendant's Trial Counsel was not ineffective, his Appellate Counsel was not ineffective for failing to raise the issue of ineffective assistance of counsel regarding Trial Counsel's handling of the "other acts" evidence.

> Defendant has not previously raised the issue of prosecutorial misconduct regarding the "bad man" evidence against the Defendant referred to during the testimony of witness Billie Smith when the Prosecutor made reference to the Defendant's conviction of the attempted solicitation of the murder of Laura Horn. Again, the Defendant alleges that both his Trial Counsel and Appellate counsel were ineffective for failing to raise this issue. Billie Smith was a character witness for the Defendant. She testified that she believed he was an honest man. (Trial Transcript p. 669.) This testimony constitutes proper use of "specific instances of conduct" under MRE 608(b). Since the questioning by the Prosecution was proper, Trial

---

[5]Under MICH. CT. R. 6.508(D)(2) and (3), a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised on direct appeal. For claims that could have been raised in a previous appeal, the defendant is entitled to relief only if he can establish "good cause" for failing to raise the grounds on appeal and "actual prejudice," as shown by a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand." MICH. CT. R. 6.508(D)(3)(a)-(b).

Counsel was not ineffective for failing to object and Appellate Counsel was not ineffective for failing to raise this issue.

The jurisdictional issue has not previously been raised. The Defendant alleges that both his trial counsel and appellate counsel are ineffective for failing to raise the issue of the jurisdictional defects. "It is a fundamental principle that defects in personal jurisdiction may be waived, whereas subject-matter jurisdiction may not be waived and may be raised at any time." *People v. Richards*, 205 Mich App 438, 444 (1994). The Defendant relies on *People v. Hill*, 44 Mich App 308 (1973) for his jurisdictional argument. In *Hill*, the defendant raised his jurisdictional argument on appeal. The Court found that the defendant raised the objection too late because "the plea to the information constituted a waiver of any defect in the complaint and warrant." *Id.* at 317. In reaching the conclusion, the Court cites the Supreme Court of Wisconsin in *State v. Raskin*, 30 Wis.2d 39, 47 (1966), which stated:

> 'By the time the preliminary examination has been completed (or waived) and there has been a bindover, probable cause has been found by an independent and neutral magistrate that the defendant has committed a crime. The reason a defendant should be permitted to raise the invalidity of his arrest under *White* (State ex rel. *White v. Simpson*, 28 Wis.2d 590, 137 N.W.2d 391 (1965) when he appears in the trial court and prior to actual arraignment and entry of a plea, is to enforce the purpose of the White rule which is to assure that arrest warrants will be issued only on probable cause as determined by a neutral magistrate.' *Hill*, 44 Mich App at 317 *quoting Raskin*, 30 Wis.2d at 47.

Further, in *People v. Mayberry*, 52 Mich App 450, 451 (1974), the Court of Appeals stated, "an invalid arrest warrant does not oust jurisdiction. To the extent *People v. Hill*, 44 Mich App 308, 205 N.W.2d 267 (1973), implies jurisdiction cannot attach. *Hill* is overruled." The Defendant was bound over following a Preliminary Exam on April 18, 2006. There was no jurisdictional defect in this case. The failure of both trial and appellate counsel to raise the allegation that jurisdiction was improper, when jurisdiction was in fact proper, does not fall below the objective standard of reasonableness. Therefore, Trial Counsel and Appellate Counsel were not ineffective regarding this issue.

Since neither Defendant's Trial Counsel nor his Appellate Counsel were ineffective and since jurisdiction in this case was proper, the Defendant's Motion for Relief from Judgment and Motion for Appointment of Counsel are DENIED.

(Oct. 13, 2009 Op. & Order, 8-10, docket #24.) In his brief in support of his habeas petition,

Petitioner agreed that the trial court found Petitioner's claims to be procedurally defaulted because

Petitioner had not shown the necessary good cause and actual prejudice under MICH. CT. R. 6.508(D). Petitioner stated that the trial court held that neither trial counsel nor appellate counsel were ineffective. (Pet'r's Br. in Supp., docket #2, Page ID#71.) However, in his Response to Respondent's answer, Petitioner argues that the trial court did not expressly state that Petitioner's claims were denied under MICH. CT. R. 6.508(D), and, thus, the claims were not procedurally defaulted. (Pet'r's Response, docket #27, Page ID#334.) The Court agrees with Petitioner's first interpretation of the court's order. Here, the trial court issued a reasoned decision finding that Petitioner failed to show good cause under MICH. CT. R. 6.508(D)(3). Thus, the second element of procedural default is satisfied because the last state court to issue a reasoned opinion denied relief under the procedural requirements of MICH. CT. R. 6.508(D).

The third element of procedural default concerns the adequacy and independence of the state procedural rule in question. "To qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed.'" *Walker v. Martin*, —— U.S. ——, 131 S. Ct. 1120, 1127 (2011) (quotation omitted). MICH. CT. R. 6.508(D) has been firmly established and regularly followed since it was enacted in 1989, and the Court of Appeals for the Sixth Circuit considers the rule to be "an independent and adequate state ground" for procedural default purposes. *Amos*, 683 F.3d at 733. Therefore, the third element of procedural default is satisfied.

Because Petitioner violated a state procedural rule, the trial court enforced the rule and the procedural rule was an adequate and independent state ground, all three elements of procedural default were satisfied. As a result, Petitioner's habeas claims are procedurally defaulted unless Petitioner can demonstrate either cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or that a lack

of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House*, 547 U.S. at 536; *Murray*, 477 U.S. at 495; *Hicks*, 377 F.3d at 551-52. As cause excusing his default, Petitioner raises the ineffective assistance of appellate counsel in Claim VI for failing to raise Petitioner's habeas claims on direct appeal. To serve as cause to excuse the default, a claim of ineffective assistance of appellate counsel must be properly exhausted. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001); *Coleman*, 244 F.3d at 538 . Petitioner raised his claim of ineffective assistance of appellate counsel in his motion for relief from judgment, which he appealed through the Michigan appellate courts. Therefore, his claims of ineffective assistance of appellate counsel are exhausted. The Court also finds that Petitioner's ineffective assistance of appellate counsel claims are not procedurally defaulted. In *Guilmette*, 624 F.3d at 291, the Sixth Circuit held that a claim of ineffective assistance of appellate counsel may not properly be deemed procedurally defaulted under MICH. CT. R. 6.508(D) when it is raised for the first time in a motion for relief from judgment under MICH. CT. R. 6.502. The court reasoned that "[t]he procedural-default rule stated by Rule 6.508(D)(3) applies only to claims that could have been brought on direct appeal, and thus – by necessity – it does not apply to claims of ineffective assistance of appellate counsel." The *Guilmette* court therefore found that the invocation of Rule 6.508(D) in such circumstances must be considered a decision on the merits of the claim.

In order to excuse his default, Petitioner must show that his appellate counsel's failure to raise the ineffectiveness of trial counsel rose to the level of a constitutional violation under *Strickland*, 466 U.S. 668; *see also McFarland*, 356 F.3d at 699. Under *Strickland*, the petitioner must prove the following to establish a claim of ineffective assistance of counsel: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient

performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. Counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. *See McFarland*, 456 F.3d at 699 (citing *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)). Thus, in order to decide whether Petitioner can present his claims of ineffective assistance of trial counsel, the Court must decide whether there is a reasonable probability that the claims would have prevailed at the time appellate counsel failed to raise them. *See McFarland*, 356 F.3d at 699.

The trial court held that counsel satisfied the performance prong of *Strickland* in all three instances of Petitioner's alleged ineffective assistance of trial counsel. In regard to trial counsel's failure to object to Laura's Horn's testimony, the trial court found the testimony to be properly admitted, and, thus, any objection by counsel would have been futile. The Court also found that any objection to Billie Smith's testimony regarding Petitioner's conviction of the attempted solicitation of murder and the November 2005 assault of Laura Horn, would have been improper under MICH. RULES OF EVID. 608(b). Finally, the trial court found that jurisdiction was proper in Petitioner's case, so any objection by trial counsel would have been improper. Defense counsel cannot be deemed ineffective for failing to make futile objections. *See United States v. Steverson*, 230 F.3d 221, 225 (6th Cir. 2000); *see also Strickland*, 466 U.S. at 690 (finding counsel's failure to make futile objections may be viewed as a strategic decision meant to preserve his credibility, and, thus, cannot be challenged). Because Petitioner's desired objections would have been futile, failure of counsel to make them could not have resulted in prejudice. *See Strickland*, 466 U.S. at 695. Because trial counsel was not ineffective, appellate counsel cannot be ineffective for failing to raise the issues. Thus, Petitioner has not shown cause for his failure to comply with the

state procedural rule. *See House*, 547 U.S. at 536; *Murray*, 477 U.S. at 495; *Hicks*, 377 F.3d at 551-52. Therefore, prejudice need not be considered. *See Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697).

As previously stated, Petitioner also has not demonstrated that manifest injustice would result because he has not made a colorable claim of innocence; he has not shown that any constitutional error "probably" resulted in the conviction of one who was actually innocent. *Schlup*, 513 U.S. at 322 (citing *Murray*, 477 U.S. at 495). Accordingly, I conclude that Petitioner's Claims I(B), I(C), III(B), III(C) and V are procedurally defaulted and may not be reviewed by this Court.

### III.    Merits

#### A.    Claim II:  Shackles

In his second ground for habeas corpus relief, Petitioner claims that he was denied his right to a fair trial when the trial court required him to be kept in leg shackles throughout the trial. Petitioner also complains that jurors saw him in shackles while he was being transported to and from the court room on at least two occasions.

Before the start of trial, defense counsel requested that Petitioner's shackles be removed. The Court allowed the correction officers to remove Petitioner's belly chains but did not allow Petitioner to remove his leg irons. Defense counsel then requested the Court to place a screen around the defense table so the jurors would not see Petitioner's leg irons. The Court then placed a cloth around the defense table. (Tr. I at 15-18.) Petitioner also notes that, in two instances, jurors were able to see his leg irons while he was being transported. The first time was in the elevator. Upon an inquiry by the trial court, that juror had no recollection of the presence of handcuffs or shackles on Petitioner. (Tr. III at 609-10.) The second encounter with jurors was near the end of

the trial. The prosecutor complained that the correction officers were using the main entrance to the courthouse to transport Petitioner, and, thus, the jurors could observe Petitioner. (Tr. IV at 745-46.) Petitioner's counsel declined to explore the issue any further, noting that the fact of Petitioner's incarceration was not a secret. (Tr. IV at 746.)

The Michigan Court of Appeals denied Petitioner's claim, stating:

The trial court denied defendant's request to attend his trial without leg restraints and defendant complains this denied him a fair trial. However, even were we to agree that the trial court abused its discretion by denying defendant's request, defendant has failed to show that he suffered prejudice as a result of the use of the restraints. *People v Robinson*, 172 Mich App 650, 654, 432 NW2d 390 (1988). The jury never saw defendant in restraints in the courtroom and our caselaw holds that a defendant is not prejudiced if the jury was unable to see the shackles on the defendant. *People v Johnson*, 160 Mich App 490, 493, 408 NW2d 485 (1987). A cloth was placed around the defense table, and the restraints were removed outside the presence of the jury before defendant walked to the witness chair to testify.

Defendant asserts that members of the jury saw him in leg restraints while he was being transported to and from the courtroom, but the prohibition against shackling does not extend to safety precautions taken by officers while transporting a defendant to and from the courtroom. *People v Panko*, 34 Mich App 297, 300, 191 NW2d 75 (1971). Further, when jurors inadvertently see a defendant in shackles, there still must be some showing that the defendant was prejudiced. *People v Moore*, 164 Mich App 378, 385, 417 NW2d 508 (1987), mod on other grounds 433 Mich 851, 442 NW2d 638 (1989). On the fourth day of trial, a deputy informed the trial court and the parties that members of the jury may have seen defendant in leg restraints while defendant was being transported to the courtroom. Defendant, however, chose not to question any jurors about what they may have seen. Also, on the third day of trial, when he was returning from lunch, a juror rode in the elevator with defendant but, when questioned by the trial court, the juror stated that he did not recall seeing leg restraints on defendant. Absent any indication that a member of the jury saw defendant in restraints, we are unable to conclude that defendant suffered any prejudice. *Id.* Therefore, defendant is not entitled to relief on the basis of this claim.

(MCOA at 3.)

In *Deck v. Missouri*, 544 U.S. 622, 629 (2005), the United States Supreme Court held that:

the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial. Such a determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.

*Id.* at 629. *Deck*'s facts and holding, however, "concerned only visible restraints at trial. The Supreme Court was careful to repeat this limitation throughout its opinion." *Mendoza v. Berghuis*, 544 F.3d 650, 654 (6th Cir. 2008). "Restraining a defendant in the courtroom, and restraining him during transport there, are two very different things." *Id.* at 655 (citing *United States v. Moreno*, 933 F.2d 362, 368 (6th Cir. 1991)). As the Sixth Circuit stated in *Mendoza*, "it is reasonable for law enforcement officers to transport custodial criminal defendants to and from courthouses across the country with restraints . . . . And jurors may well expect criminal defendants—at least ones charged with the kind of conduct at issue here—to be restrained during transport to the courtroom." *Id.* (emphasis and additional quotation marks omitted).

Here, the Michigan Court of Appeals factually found that Petitioner's leg restraints were not visible to the jurors at his trial because of the cloth around defense counsel's table. A federal district court must presume the correctness of state court factual determinations, and a habeas petitioner may rebut this presumption only with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. Petitioner has not presented any evidence that his leg shackles were visible in the courthouse during the trial. He merely complains that a cloth was not also placed around the prosecution's table so as not to bring attention to defense counsel's table. (Pet'r's Response, docket #27, Page ID#343.) Petitioner's argument is unpersuasive. The Supreme Court is only concerned with restraints that are visible at trial. *See Deck*, 544 U.S. at 629; *see also Mendoza*, 544 F.3d at 654; *Freeman v. Trombley*, 744 F. Supp. 2d

697, 716–17 (E.D. Mich. 2010) (state appellate court's determination that petitioner did not experience a due process violation due to allegedly appearing in court wearing prison garb and shackles was neither contrary to nor involved unreasonable application of clearly established federal law; there was no evidence that anyone on jury had seen petitioner so attired).

Moreover, the Supreme Court has not held that a petitioner's constitutional rights are violated when jurors see a petitioner shackled during transport to and from the courtroom. It is reasonable for corrections officers to shackle the petitioner while being transported for safety reasons. *See Mendoza*, 544 F.3d at 655.

Even if Petitioner had shown that his shackling violated the Due Process Clause, any error was harmless. Harmless error is assessed under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Fry v. Pliler*, 551 U.S. 112, 121–22 (2007); *see also Cook v. Smith*, No. 10–3182, 2012 WL 934033, at *3 (6th Cir. Mar. 21, 2012). Under *Brecht*, this court must consider whether the constitutional error in the state criminal trial had a "substantial and injurious effect" on the result. *Brecht*, 507 U.S. at 638. Upon review, I conclude that any constitutional error in shackling Petitioner did not have a substantial and injurious effect on the jury's verdict. As can be seen from the Court's recitation of fact, the evidence of Petitioner's guilt was overwhelming. Accordingly, the Michigan Court of Appeals' decision rejecting Petitioner's due-process claim was not contrary to, or an unreasonable application of clearly established law.

## B.     Ineffective Assistance of Trial Counsel

Petitioner asserts that he was denied effective assistance of trial counsel for the following reasons:

1. Claim III(D): Petitioner's trial counsel was ineffective for failing to object to the prosecutor's use of Petitioner's invocation of his right to silence as substantive evidence of guilt.

2. Claim III(F): Petitioner's trial counsel was ineffective for failing to object to the fact that certain jurors saw him in shackles outside of the courtroom.

3. Claim III(G): Petitioner's trial counsel was ineffective for failing to be present during a critical stage.

4. Claim III(H): Petitioner's trial counsel was ineffective for failing to investigate and present witnesses at trial.

5. Claim III(I): Petitioner's trial counsel was ineffective for failing to introduce Laura Horn's blue jeans as evidence.

6. Claim III(J): Petitioner's trial counsel was ineffective for failing to properly argue the duct tape evidence.

7. Claim III(K): Petitioner's trial counsel was ineffective for failing to impeach Laura Horn's testimony with the police reports.

8. Claim III(L): Petitioner's trial counsel was ineffective for failing to make a motion for a new trial based on the verdict being against the great weight of the evidence.

In *Strickland*, 466 U.S. at 687-88, the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. As previously discussed, in order to establish a claim of ineffective assistance of counsel, the petitioner must prove both that counsel's performance was objectively unreasonable and that counsel's deficient performance was constitutionally prejudicial. A reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel*, 350 U.S. at 101); *see also Nagi*, 90 F.3d at 135 (holding that counsel's strategic decisions were hard to attack). The court must determine whether,

in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court recently has observed, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Richter*, 131 S. Ct. at 788 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *see also Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficult of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Richter*, 131 S. Ct. at 786).

### 1. Claim III(D): Failure to Object to Post-Arrest Silence

In Claim III(D), Petitioner claims that trial counsel was ineffective for failing to object to the prosecutor's closing argument about Petitioner's post-arrest silence. Specifically, Petitioner refers to the following except from the prosecutor's closing argument:

> There is absolutely no evidence whatsoever in this trial that the defendant made any statement whatsoever about his involvement with this crime to the police. The police have no idea what they are investigating. They have no idea what they have to prove. So they go through the investigation as they see fit. The only information that they do have is the information that they are given by the victim.

(Tr. IV at 805.)

Applying the *Strickland* standard, the Michigan Court of Appeals held that trial counsel was not ineffective for failing to make an objection, stating:

- 44 -

Defendant asserts that counsel failed to object to the prosecutor's closing remarks about defendant's pretrial silence. Defendant correctly notes that a defendant's silence after he or she has been informed of the right to remain silent under *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966), may not be used as evidence against the defendant. *People v. Dennis*, 464 Mich 567, 573–574, 628 NW2d 502 (2001). However, we must consider a prosecutor's comments in light of the defendant's arguments. *People v. Messenger*, 221 Mich App 171, 181, 561 NW2d 463 (1997). Considering the remarks in this light, we conclude that the prosecutor did not use defendant's silence after being advised of his Miranda rights to argue that defendant was guilty. Rather, the prosecutor used defendant's silence to rebut defendant's argument that the police failed to adequately investigate the events of the evening in question. Counsel is not ineffective for failing to make a futile objection, *People v Fike*, 228 Mich App 178, 182, 577 NW2d 903 (1998), and defendant has failed to establish that an objection during the prosecutor's rebuttal argument would have been meritorious.

Moreover, if we concluded that the prosecutor improperly commented on defendant's post-Miranda silence, counsel's failure to object did not fall below an objective standard of reasonableness. Our Supreme Court has recognized that "there are times when it is better not to object and draw attention to an improper comment." *People v Bahoda*, 448 Mich 261, 287 n 54, 531 NW2d 659 (1995). Counsel may have believed that it was better not to draw the jury's attention to the fact that defendant never offered a statement to the investigating officers. Defendant has failed to overcome the strong presumption that counsel engaged in sound trial strategy. *People v. Sabin (On Second Remand), supra.*

(MCOA at 4-5) (footnote omitted.)

Petitioner's claim implicates the Supreme Court's holding in *Doyle*. In *Doyle v. Ohio*, 426 U.S. 610, 619 (1976), the Supreme Court held "that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." The theory underlying *Doyle* is that, while *Miranda* warnings contain no express assurance that silence will carry no penalty, "such assurance is implicit to any person who receives the warnings." *Id.* at 618. On this reasoning, the Court concluded that it would be fundamentally unfair first to induce a defendant to remain silent through

- 45 -

*Miranda* warnings and then to penalize the defendant who relies on those warnings by allowing the defendant's silence to be used to impeach an exculpatory explanation offered at trial. *Id.*

As fully discussed by the Michigan Court of Appeals, the prosecutor's remarks were not made to prove that Petitioner was guilty, but to rebut defense counsel's argument that the police failed to adequately investigate the events. *See United States v. Martinez-Larraga*, 517 F.3d 258, 268 (5th Cir.2008) ("*Doyle* also expressly recognizes that a prosecutor's reference to [post-arrest silence] may properly be made where it is not used to impeach the defendant's exculpatory story, or as substantive evidence of guilt, but rather to respond to some contention of the defendant concerning his post-arrest behavior." (internal quotation marks omitted)). The Court also reasonably held that counsel's decisions not to object constituted reasonable trial strategy not to reinforce the comment. Further, because Petitioner fails to establish that the prosecutor committed *Doyle* error, he cannot show "a reasonable probability" that but for his counsel's lack of objection, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. For all these reasons, the decision of the Michigan Court of Appeals was an entirely reasonable application of *Strickland*.

## 2.    Claim III(F): Failure to Object to Shackles

Petitioner argues that his trial counsel was ineffective for failing to object to the fact that certain jurors saw him in shackles outside of the courtroom. The Michigan Court of Appeals rejected Petitioner's claim, as follows:

> [3][D]efendant also complains that counsel failed "to timely object" after members of the jury saw defendant in leg restraints. However, as previously explained, the record does not establish that any member of the jury actually saw defendant in restraints. Accordingly, defendant has failed to establish the factual predicate for his claim. *People v Hoag*, 460 Mich 1, 6, 594 NW2d 57 (1999).

(MCOA at 5 n.3.)   The Michigan Court of Appeals found that no member of the jury actually noticed Petitioner had leg restraints.   State court factual determinations are presumed correct, and a habeas petitioner may rebut this presumption only with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.  Petitioner has not rebutted the presumption.   Moreover, this Court found that the Petitioner's shackles did not violate the Due Process Clause in Section III(A), and, thus, Petitioner cannot show that counsel's failure to object satisfied the performance prong of *Strickland*.  It was entirely reasonable for corrections officers to shackle Petitioner while being transported for safety reasons, *see Mendoza*, 544 F.3d at 655. Accordingly, the decision of the Michigan Court of Appeals was not an unreasonable application of *Strickland*.

### 3.      Claim III(G): Failure of Counsel to be Present at Critical Stage

In Claim III(G), Petitioner argues that trial counsel was ineffective for failing to be present during pre-trial, a critical stage of the proceedings, and for failing to call and interview witnesses.  Specifically, Petitioner contends that trial counsel only met with him for ten minutes prior to his preliminary examination and for five minutes prior to a competency hearing, and failed to ask Petitioner about his version of the events except for five minutes prior to Petitioner's testimony.  (Pet'r's Br. in Supp., docket #2, Page ID#130; Pet'r's Response, docket #27, Page ID##348-49.)  Petitioner also claims that trial counsel did not interview any witnesses but had Petitioner's sister interview witnesses.  Further, Petitioner states that trial counsel refused to call at least three witnesses that would have testified as to how Petitioner could not do any heavy lifting in January 2006.  (Pet'r's Br. in Supp., docket #2, Page ID#136.)

The Michigan Court of Appeals rejected Petitioner's arguments, stating:

Defendant argues that under *United States v Cronic*, 466 US 648, 104 S Ct 2039, 80 L Ed 2d 657 (1984), he is entitled to a presumption that prejudice occurred because defense counsel failed to spend adequate time meeting with him. He also claims that defense counsel failed to personally interview defense witnesses before trial. However, these claimed deficiencies are not apparent from the record and, thus, are not subject to our review. *See People v Odom*, 276 Mich App 407, 417, 740 NW2d 557 (2007).

(MCOA at 4.)

Petitioner argues that his claims fall under *United States v. Cronic*, 466 U.S. 648 (1984). In *Cronic*, the Supreme Court held that the denial of counsel during a critical stage of the proceeding amounts to a *per se* denial of the effective assistance of counsel. *See Cronic*, 466 U.S. at 648. In *Bell*, 535 U.S. at 685, the Supreme Court defined the differences between claims governed by *Strickland* and claims governed by *Cronic*. If a claim is governed by *Strickland*, a defendant typically must demonstrate that specific errors made by trial counsel affected the ability of the defendant to receive a fair trial. If a claim is governed by *Cronic*, however, the defendant need not demonstrate any prejudice resulting from the lack of effective counsel. *See Mitchell v. Mason*, 325 F.3d 732, 741 (6th Cir. 2003) (citing *Bell*, 535 U.S. at 695). Three types of cases warrant the presumption of prejudice: (1) when the accused is denied the presence of counsel at a critical stage, resulting in the complete denial of counsel; (2) when counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) when counsel is placed in circumstances in which competent counsel very likely could not render assistance. *Mitchell*, 325 F.3d at 742 (quoting *Bell*, 535 U.S. at 695). Petitioner argues the first category of *Cronic*.

It is well accepted that the "pre-trial period" constitutes a "critical period" for purposes of the *Cronic* analysis because it is during the pre-trial period that counsel is obligated to "make reasonable investigations or to make a reasonable decision that makes particular

investigations unnecessary." *Mitchell*, 325 F.3d at 743.. Naturally, if counsel fails to consult with the client during the critical pre-trial periods, he cannot fulfil his duty to reasonably investigate matters. *Id*. Petitioner relies on the Sixth Circuit's decision in *Mitchell*, 325 F.3d at 743. (Pet'r's Br. in Supp., docket #2, Page ID##130-31.) In *Mitchell*, the Sixth Circuit granted habeas corpus relief to a Michigan prisoner whose counsel was suspended from practice for the entire month preceding trial, never interviewed Petitioner before trial, failed to respond to Petitioner's letters, failed to respond to Petitioner's mother's letters, and failed to speak with or call witnesses to the events underlying the charge of first-degree murder. The Sixth Circuit also noted that during the entire course of defense counsel's seven month representation, he met with the petitioner for a total of six minutes. *Mitchell*, 325 F.3d at 746–48. The *Mitchell* court concluded that the combination of circumstances resulted in a complete denial of counsel during the critical pretrial investigation phase. *Id.* at 741.

The Sixth Circuit's holding in *Mitchell* was a narrow one, limited strictly to its facts. Unlike the circumstances in *Mitchell*, there is no evidence that Petitioner's attorney was suspended from the practice of law at any point during his representation of Petitioner. Here, Petitioner's counsel was appointed to, and met with, Petitioner before the preliminary examination and his competency hearing, albeit for a few minutes. Petitioner's counsel also represented Petitioner at his preliminary examination. Further, in *Mitchell*, the petitioner had repeatedly asked the court for new counsel because his current lawyer refused to meet with him. Petitioner, however, gave no indication that he wanted a different lawyer, nor did he alert the trial court to any failure of his counsel to meet with him before the commencement of trial. Finally, it appears in this case, unlike

*Mitchell*, that Petitioner's counsel made at least some attempt to investigate the case, reflected by the fact that he submitted a witness list to the trial court. (Defendant's Witness List, docket #20).

Petitioner, however, contends that his counsel sought the assistance of Petitioner's sister to help gather and interview witnesses on behalf of Petitioner. (Pet'r's Br. in Supp., docket #2, Page ID#134.) It seems odd that Petitioner's sister would know who to contact for an interview and what questions to ask the interviewees without information from Petitioner's counsel. Further, Petitioner's counsel would have had to review the information from the interviewees to effectively question defense witnesses. Contrary to Petitioner's assertion, such allegations fall far short of the constructive denial of counsel that the Sixth Circuit found warranted *Cronic* review in *Mitchell*, 325 F.3d at 742; *see also Ivory v. Jackson*, 509 F.3d 284, 295 (6th Cir. 2007) (recognizing that *Mitchell* rested on the fact that the defendant was denied the *presence* of counsel during the critical stages because counsel was suspended from practice during the entire month preceding trial). As a consequence, Petitioner is not entitled to a presumption of prejudice under *Cronic*, and the Court will apply the *Strickland* analysis.

Petitioner has not shown that counsel's performance fell below an objective standard of reasonableness during the pre-trial stage. Petitioner's counsel clearly was prepared for trial, had a sound and coherent trial strategy, met with Petitioner on at least two occasions prior to trial, represented Petitioner in his preliminary examination, conducted substantial cross-examination during the preliminary examination, and prepared a witness list for several witnesses to testify for the defense. Where counsel's performance did not fall below an objective standard of reasonableness, the court need not reach the question of prejudice. *See United States v. Foreman*,

323 F.3d 498, 504 (6th Cir. 2003). Accordingly, the Michigan Court of Appeals decision was not based on an unreasonable application of *Strickland*.

### 4.        Claims III(H), III(I), III(J) & III(K)

In Claims III(H), III(I), III(J), III(K), Petitioner argues that counsel failed to adequately question defense witnesses and call other witnesses (Claim III(H)), counsel failed to introduce Laura Horn's blue jeans as evidence (Claim III(I)), counsel failed to properly argue the duct tape evidence (Claim III(J)), and counsel failed to impeach Laura Horn's testimony with police reports (Claim III(K)).

The Michigan Court of Appeals rejected Petitioner's arguments, as follows:

> Defendant further contends that defense counsel failed to (1) adequately question defense witnesses about defendant's physical limitations in January 2006, (2) call other witnesses, (3) present as evidence the blue jeans [Laura Horn] wore on the night of the assault, (4) cross-examine [Laura Horn] regarding inconsistencies in her statements to the investigating police officers, (5) argue that the duct tape found in defendant's truck was consistent with defendant's testimony that he and [Laura Horn] mutually agreed to use the tape as a restraint during consensual sex. Decisions regarding what evidence to present, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy, *People v Rockey*, 237 Mich App 74, 76, 601 NW2d 887 (1999), as is a decision concerning what evidence to highlight during closing argument, *In re Rogers*, 160 Mich App 500, 505–506, 409 NW2d 486 (1987). We will not second-guess counsel on matters of trial strategy, nor [will we] assess counsel's competence with the benefit of hindsight. *People v. Rice* (On Remand), 235 Mich App 429, 445, 597 NW2d 843 (1999). Defendant has failed to overcome the strong presumption that counsel engaged in sound trial strategy.

(MCOA at 4.)

#### a.        Claim III(H): Failure to Adequately Question Defense Witnesses & Call Additional Witnesses

For Claim III(H), Petitioner has not established that counsel's decision not to further question defense witnesses about Petitioner's physical limitations and not to call three additional

defense witnesses was constitutionally deficient under *Strickland*. The decision of which witnesses to call and what evidence to present generally is reserved for counsel's discretion. *See Foreman*, 323 F.3d at 504; *see also Biglow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 689). It is true that the failure to call a particular witness can, in certain circumstances, amount to ineffective assistance of counsel. These circumstances, however, are limited to cases in which there has been a complete failure to investigate the witness or explain the reason for the failure to investigate, and also a demonstration that the witness with whom counsel failed to call did, in fact, have favorable testimony to offer. *See Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2006); *Towns v. Smith*, 395 F.3d 251, 258–59 (6th Cir. 2005). The three witnesses that Petitioner alleges counsel failed to call were going to testify about Petitioner's physical limitations in January 2006. (Pet'r's Br. in Supp., docket #2, Page ID#135-37.) Petitioner testified that he had a stroke in November 2005. As of January 2006, Petitioner stated that he was still experiencing weakness from the stroke. (Tr. IV at 722-23.) Petitioner's mother, Barbara Horn, also testified as to Petitioner's physical limitations caused by his stroke. Barbara testified that because of his stroke, Petitioner had difficulty using his right arm and leg. (Tr. III at 647, 652.) By the end of January, Barbara stated that Petitioner had not yet fully recovered from the stroke. (Tr. III at 652.) It was entirely reasonable for Petitioner's counsel not to bolster the testimony of Petitioner or other defense witnesses with additional testimony regarding his stroke, and, thus, Petitioner fails to allege that counsel's performance fell below an objective standard of reasonableness.

Moreover, the three witnesses that Petitioner wished to have testify would have provided cumulative testimony. Their testimony might or might not have been as persuasive as that already given, and might have opened the door to adverse testimony. Each witness must be

evaluated separately by defense counsel. Here, he had already made his point. *Strickland*'s

prejudice prong cannot be met where the omitted testimony would be cumulative to other evidence

already on the record. *See Hanna v. Ishee,* 694 F.3d 596, 619 (6th Cir. 2012) (citing *Broom v.*

*Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006) and *Clark v. Mitchell*, 425 F.3d 270, 286 (6th Cir.

2005)). Petitioner's trial counsel claims therefore fail under both prongs.

In summary, the Michigan Court of Appeals' decision was not an unreasonable

application of *Strickland*.

### b.    Claim III(I): Failure to Introduce Jeans as Evidence

In Claim III(I), Petitioner argues that defense counsel was ineffective for failing to

introduce Laura Horn's blue jeans from January 28, 2006 as evidence. Petitioner states that his

counsel looked over the jeans during trial and told Petitioner that "there was no oil or dirt on the blue

jeans" but did not introduce the jeans into evidence. (Pet'r's Br. in Supp., docket #2, Page ID#138.)

During closing arguments, Petitioner's counsel argued:

> The back of the truck is dirty. You saw it. You heard it described by the
> police officers. You saw the pictures. There's drywall dust. There's oily residue.
> There's all kinds of things in the back of this truck. One would think that the coat -
> perhaps her pants - would have evidence of this. Weren't presented to you.

(Tr. IV at 785-86.)

The Court of Appeals found that defense counsel's decision not to introduce the

evidence of Laura Horn's blue jeans was strategic. (MCOA at 4.) Defense counsel's strategic

choices are granted a "high level of deference" under the "'presumption that, under the

circumstances, the challenged action might be considered sound trial strategy.'" *Davis*, 658 F.3d at

538 (quoting *Strickland*, 466 U.S. at 689). Petitioner bears the burden of establishing that his

counsel's performance was deficient, *McPhearson v. United States*, 675 F.3d 553, 559 (6th Cir. 2012), and he has failed to present sufficient evidence to meet this burden. When Petitioner's counsel looked over the jeans, it was entirely reasonable that he did not want to introduce Laura Horn's jeans as evidence for the defense. There may have been other inculpatory evidence on the jeans. Or it may have been more useful for Petitioner's trial counsel to call the jurors' attention to the fact that the prosecution did not bring in the evidence of the jeans. Defense counsel argued in his closing statement that: "[u]nanswered questions means reasonable doubt." (Tr. IV at 793.) The lack of evidence of the jeans bolstered the defense theory that Laura Horn went with Petitioner willingly to have consensual sexual relations. As Petitioner has failed to satisfy the first prong of the *Strickland* standard, the Michigan Court of Appeals' decision was not an unreasonable application of *Strickland*.

### c. Claim III(J): Failure to Argue Duct Tape as Evidence

In Claim III(J), Petitioner argues this his trial counsel was deficient for failing to connect that the duct tape found in the cooler in the truck was used by Petitioner and Laura Horn for bondage during sexual intercourse on January 28, 2006. Petitioner testified that Laura Horn asked Petitioner if he had anything they could use for bondage during sex. (Tr. IV at 707.) Petitioner retrieved duct tape from his truck. (Tr. IV at 707-08.) Petitioner stated that he and Laura used the duct tape during sex. (Tr. IV at 712-13.) Before Petitioner locked up the house the next morning, Petitioner noted that Laura placed the duct tape in the cooler. (Tr. IV at 720.)

The Michigan Court of Appeals found trial counsel' failure to raise the duct tape argument was reasonable as a matter of trial strategy. (MCOA at 4.) Substantial deference is given to counsel's decisions not to raise an argument, even a meritorious argument, if the decision " 'might

be considered sound trial strategy.'" *Davis*, 658 F.3d at 538 (quoting *Strickland*, 466 U.S. at 689). An omission by counsel in closing arguments will not be deficient unless his failure to raise the argument was objectively unreasonable.

On rebuttal, Laura Horn testified that she had never engaged in bondage during the course of sexual relations with Petitioner. (Tr. IV at 760.) In light of Laura's testimony, trial counsel may have decided not to highlight the Petitioner's testimony regarding bondage in his closing statement. "[N]ot drawing attention to [a] statement may be perfectly sound from a tactical standpoint." *United States v. Caver*, 470 F.3d 220, 244 (6th Cir. 2006). Because it was entirely reasonable for trial counsel not to link the duct tape evidence to Petitioner's testimony, the Michigan Court of Appeals' decision was not based on an unreasonable application of *Strickland*.

**d.      Claim III(K): Failure to Question Laura Horn as to Discrepancy**

In Claim III(K), Petitioner argues that trial counsel failed to question Laura Horn regarding the discrepancy between which hand Petitioner allegedly used to force her into his truck. (Pet'r's Br. in Supp., docket #2, Page ID#140.) At trial, Petitioner's argues that Laura never testified as to which hand Petitioner used to force her in the truck. However, in police statements, Laura testified that Petitioner grabbed her with his left hand, and, later, stated that he grabbed her with his right hand. (*Id.*)

The Michigan Court of Appeals concluded that it will not "second-guess counsel on matters of trial strategy, nor we will assess counsel's competence with the benefit of hindsight." (MCOA at 4) (citations omitted.) Even if Petitioner satisfied the performance prong of *Strickland* on failing to question Laura regarding the discrepancy in which hand Petitioner allegedly used to force her into the truck, he fails to satisfy the prejudice prong. As previously stated, there was

overwhelming evidence of Petitioner's guilt. The fact that Petitioner's trial counsel may have missed one inconsistency in Laura's description of the events, easily explainable in the confusion and violence of the moment, does not render the trial fundamentally unfair. Accordingly, the Michigan Court of Appeals' decision was not based on an unreasonable application of *Strickland*.

### 5.      Claim III(K): Motion for Remand

Petitioner argues that his trial counsel was ineffective for failing to make a motion for a new trial based on the verdict being against the great weight of the evidence.

The Michigan Court of Appeals rejected Petitioner's claim, stating:

> Defendant avers that defense counsel was ineffective for failing to move for a new trial on the ground that the jury's verdict was against the great weight of the evidence. Because the jury's verdict was not against the great weight of the evidence, any motion by defense counsel for a new trial would have been futile, and trial counsel is not ineffective for failing to make a futile motion. *Fike, supra.*

(MCOA at 6 n.5.)

The assertion that the verdict was against the great weight of the evidence does not state grounds for habeas corpus relief. The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). The Michigan courts apply the great-weight-of-the-evidence standard to determine whether to grant a new trial. *See People v. Lemmon*, 576 N.W.2d 129, 137 (Mich. 1998). This question is distinct from the due-process guarantee offended by insufficient evidence and "does not implicate issues of a constitutional magnitude." *Id.* at 133. As a consequence, a "weight of the evidence claim" is purely a matter of state law and is not cognizable on habeas review. *See* 28 U.S.C. § 2254(a); *Wilson v. Corcoran*, ––– U.S. –––, 31 S. Ct. 13, 16 (2010) ("[I]t is only noncompliance with federal law that renders a state's criminal judgment susceptible to a collateral attack in the federal courts."); *Estelle v.*

*McGuire*, 502 U.S. 62, 68 (1991) ( "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); *accord Chatman v. Warden Ross Corr. Inst.*, No. 2:10–cv–1091, 2013 WL 1663919, at *10 (S.D. Ohio Mar. 26, 2013); *Underwood v. Berghuis*, No. 1:08–cv–642, 2011 WL 693 8471, at *15 (W.D. Mich. Aug. 8, 2011) ("Since a 'weight of the evidence claim' is purely a matter of state law, it is not cognizable on habeas review."). Because this Court lacks authority to review a state court's application of its own law, the state-court determination that the verdict was not against the great weight of the evidence is final. Having found that there was ample evidence to support the verdict, the state court determined that counsel was not ineffective in filing a motion to remand, as such a motion would have been futile. That determination was patently reasonable. The Sixth Circuit repeatedly has held that an attorney's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004).

In summary, the Michigan Court of Appeals' decisions regarding the denial of Petitioner's claims of ineffective assistance of counsel were not based on unreasonable applications of *Strickland*.

### C. Claim VII: Actual Innocence

In Claim VII, Petitioner argues that two documents show that he is actually innocent. These documents and his claim of innocense were previously mentioned in section II(A)(1), *supra*. Both documents predated his trial.

Claims of actual innocence based on newly-discovered evidence "have never been held to state a ground for federal habeas relief absent an independent constitutional violation

- 57 -

occurring in the underlying state criminal proceeding." *Herrera*, 506 U.S. at 400. "[F]ederal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact." *Id.* In *House v. Bell*, the United States Supreme Court declined to answer the question left open in *Herrera*—whether a habeas petitioner may bring a freestanding claim of actual innocence. *Bell*, 547 U.S. at 555 (noting that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional and warrant federal habeas relief if there were no state avenue open to process such a claim").

Citing *Herrera* and *House*, the Sixth Circuit Court of Appeals has ruled that a free-standing claim of actual innocence based upon newly discovered evidence does not warrant federal habeas relief. *See Cress v. Palmer*, 484 F.3d 844, 854–55 (6th Cir. 2007); *Wright v. Stegall*, 247 F. App'x 709, 711 (6th Cir. 2007) ("Since the Supreme Court has declined to recognize a freestanding innocence claim in habeas corpus, outside the death-penalty context, this court finds that [Petitioner] is not entitled to relief under available Supreme Court precedent."); *see also Sitto v. Lafler*, 279 F. App'x 381, 381–82 (6th Cir. 2008) (affirming denial of habeas relief on similar claim). As a consequence, any freestanding claim of actual innocence is without merit.

However, a claim of actual of innocence is a gateway through which a habeas petitioner must pass to have an otherwise barred federal constitutional claim considered on the merits. *Schlup*, 513 U.S. at 315; *Hererra*, 506 U.S. at 404; *Murray*, 477 U.S. at 496; *Hodgson v. Warren*, 622 F.3d 591, 601 (6th Cir. 2010). The issue of actual of innocence ordinarily arises in the context of a habeas petitioner's efforts to excuse a procedural default on a habeas claim, as in the present case. *See e.g. Turner v. Romanowski*, 409 F. App'x 922, 926–27 (6th Cir. 2011); *Souter v. Jones*, 395 F.3d 577,

589–90 (6th Cir. 2005).  As previously discussed in section II(A)(1) of this decision, Petitioner has

failed to introduce any new evidence, much less evidence that would have required a reasonable

factfinder to vote him not guilty beyond a reasonable doubt.  *Coleman*, 244 F3d at 540.

Consequently, Petitioner's actual-innocence claim is without merit.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition

be denied.


Dated:  September 24, 2013                    /s/ Hugh W. Brenneman, Jr.
                                              HUGH W. BRENNEMAN, JR.
                                              United States Magistrate Judge



### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of
service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and
responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely
objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d
947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).